**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

FEDERAL INSURANCE COMPANY,

                                Civil No. 21-2093 (JRT/DTS)

               Plaintiff,

v.                         **MEMORANDUM OPINION AND ORDER**
                                  **ADDRESSING CROSS MOTIONS FOR**

3M COMPANY,                  **PARTIAL SUMMARY JUDGMENT**

               Defendant.

---

Catherine Geisler, Todd S. Schenk, and Zachary R. Greening, **TRESSLER LLP**, 233 South Wacker Driver, Sixty-First Floor, Chicago, IL 60606; Charles E. Spevacek, **MEAGHER & GEER, PLLP**, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for plaintiff.

Jared Zola, **BLANK ROME LLP**, 1271 Avenue of the Americas, New York, NY 10020; James R. Murray and Omid Safa-Esfahani, **BLANK ROME LLP**, 1825 Eye Street Northwest, Washington, DC 20006; Andrew J. Pieper and Bradley R. Prowant, **STOEL RIVES LLP**, 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for defendant.

Federal Insurance Company ("Federal") and 3M Company seek declarations of coverage under insurance policies for injuries allegedly caused by a 3M product. 3M Company is a defendant in more than 5,000 product liability cases arising from the design and manufacture of the Bair Hugger Patient Warming System. These cases have been centralized for pretrial proceedings in multidistrict litigation ("MDL") in the District of Minnesota. Federal issued product liability insurance policies covering some but not all of the cases against 3M. The insurance policies have deductibles that 3M must meet

before Federal is obligated to pay on the polices and have clauses requiring Federal to defend 3M against suits arising under the policies.  Federal brought this action against 3M seeking a declaratory judgment that (1) 3M must pay a deductible for each injury; (2) the defense costs of the MDL should be apportioned based upon the proportion of cases that Federal's policies cover; and (3) Federal need only pay the necessary and reasonable post-notice costs of the MDL defense.  3M answered and counterclaimed (1) seeking a declaratory judgment that it need only pay one deductible per policy period; (2) seeking a declaratory judgment that Federal is liable for the full cost of the MDL defense; and (3) for breach of contract alleging Federal has failed to defend 3M as required by the policy contracts.

The parties filed cross motions for partial summary judgment on their first two claims to resolve (1) how many deductibles 3M is responsible for and (2) whether Federal is responsible for the full litigation costs of defending against the MDL or whether the costs should be allocated based upon the cases with claims covered by the policies as opposed to those not covered by the policies.

On the deductible issue, 3M is only responsible for one deductible per policy period, because the policies' deductible's occurrence or event language applies to the design and manufacture of the devices.  Thus, the Court will deny Federal's Motion and grant 3M's Motion as to the deductible dispute.  On the litigation defense costs issue, because MDLs are not a single, monolithic case, but rather the individual cases within an

MDL remain distinct, Federal need only pay the defense costs associated with cases covered by the policies it issued, not the full cost of the MDL defense. Thus, the Court will grant in part Federal's Motion and deny 3M's Motion as to the defense cost dispute. The Court only grants in part Federal's Motion because the Court will not adopt the remedy Federal proposes, instead leaving it to be resolved at a later stage.

## BACKGROUND

### I.    FACTUAL BACKGROUND

Arizant Healthcare, Inc. ("Arizant") was the designer, developer, manufacturer, and seller of the Bair Hugger Patient Warming System ("Bair Hugger"). (Rule 26(f) Report at 5, Jan. 11, 2022, Docket No. 24.)[1] The Bair Hugger is designed to maintain a patient's body temperature during surgery by forcing warm air through a blanket. (Federal's Compl. ¶ 7, Sept. 22, 2021, Docket No. 1.)

Federal issued Arizant a series of annual general liability insurance policies, bearing policy number 7498-46-55 MIN, effective from April 1, 2003, through October 13, 2010 (collectively, "Federal Insurance Policies" or "Policies"). (Rule 26(f) Report at 5.)

On or about October 13, 2010, 3M acquired Arizant. (*Id.*) As a result, 3M is the successor in interest to Arizant's rights as an insured under the Federal Insurance

---

[1] For clarity, the Court uses CM/ECF pagination for all citations to the record.

Policies.[2]  (*Id.*)  The Policies were originally effective through April 1, 2011, but 3M cancelled the final policy effective October 13, 2010.  (*Id.*)

Thousands of product liability claims have been filed against 3M seeking damages for bodily injuries allegedly caused by defects in the design, development, manufacturing, and sale of the Bair Hugger product.  (*Id.*)  These cases were transferred into multi-district litigation in the District of Minnesota named *In re: Bair Hugger Forced Air Warming Devices Product Liability Litigation*, MDL 15-2666 (D. Minn.) ("Bair Hugger MDL" or the "MDL").  (*Id.*)

Some of the alleged bodily injuries took place while the Federal Insurance Policies were in effect.  (*Id.*)  Other alleged injuries took place either before the Policies were in effect or after the final Policy was cancelled.  (*Id.*; 1st Aff. of Todd S. Schenk ("1st Schenk Aff.") ¶ 5, Apr. 15, 2022, Docket No. 40.)  In total, the Bair Hugger MDL currently contains about 5,560 claims of which 1,155 (or about 20 percent) allege a bodily injury occurred because of a surgery between April 1, 2003, to October 13, 2010, when the Policies were in effect.  (1st Schenk Aff. ¶¶ 3–6.)

3M tendered the MDL to Federal for coverage under the Policies.  (Rule 26(f) Report at 5.)  3M has incurred attorney fees and other litigation costs defending against the MDL, but Federal has not paid any of these costs.  (*Id.* at 6.)  This litigation and the

---

[2] The Court collectively refers to Arizant and 3M as 3M throughout this Order.

MDL are ongoing after the Eighth Circuit reversed a grant of summary judgment for 3M and remanded the case.  (*Id.*)

At issue here is the effect of two different sections of the Policies: (1) the definition of "occurrence" or "event" for the purposes of the Policies' deductibles and (2) the provisions governing Federal's duty to defend 3M.

### A.    The Policies' Deductible Language

Each policy had a deductible that applied either on a "Per Occurrence" or on an "Each Event" basis.

### 1.    Per Occurrence Deductible

For the 2003–2004, 2004–2005, 2005–2006, 2006–2007, and 2007–2008 Policies, each policy has a deductible endorsement explaining how the deductible is to be applied:

> Per Occurrence basis – the deductible amount applies to all damages, defense costs, and other Supplementary Payments because of:
>
> - all **bodily injury** or **property damage** as the result of any one **occurrence**, regardless of the number of persons or organizations who sustain damages because of that **occurrence**.

(Decl. of Jared Zola ("Zola Decl."), Ex. C at 63, Mar. 25, 2022, Docket No. 33; Zola Decl., Ex. D at 81; Zola Decl., Ex. E. at 90; Zola Decl., Ex. F at 90, Zola Decl., Ex. G at 93 (emphasis in original).)

The "per occurrence" policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

(Zola Decl., Ex. C at 49; Zola Decl., Ex. D at 52; Zola Decl., Ex. E. at 60; Zola Decl., Ex. F at 60, Zola Decl., Ex. G at 61.)

The first policy—the 2003–2004 Policy—by default applied the deductible on a "Per Claim" basis before the endorsement changed it to the "per occurrence" method. (Zola Decl., Ex. C at 9.)  "Claim" is not defined in this policy.

### 2.    Each Event Deductible

Beginning with the 2008–2009 Policy, Federal used a new policy form that provided two different options for how deductibles would be applied: on an "Each Claim" basis or on an "Each Event" basis.  In the 2008–2009, 2009–2010, and 2010–2011 Policies, an endorsement described how these options worked:

> If the applicable Deductible is indicated to apply on the basis of:
>
> - Each Claim, then the amount of the Deductible applies separately to the sum of amounts described in the provision titled Deductible Obligations, in connection with loss allocable to each separate person and organization that arises out of each separate "event."
>
> - Each "Event," then the amount of the Deductible applies separately to the sum of amounts described in the provision titled Deductible Obligations, in connection with loss that arises out of each separate "event."

(Zola Decl., Ex. H at 90; Zola Decl., Ex. I at 18; Zola Decl., Ex. J at 99.)

These Policies defined "Event" as "an occurrence, offense, wrongful act or other cause of loss as described under the applicable Coverage."  (Zola Decl., Ex. H at 93; Zola Decl., Ex. I at 15; Zola Decl., Ex. J at 102.)

The Each Event Policies also defined "Occurrence" with the same definition as the earlier Per Occurrence policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Zola Decl., Ex. H at 62; Zola Decl., Ex. I at 56; Zola Decl., Ex. J at 63.)

The 2008–2009, 2009–2010, and 2010–2011 Policies all applied the deductible on an "Each Event" basis, not an "Each Claim" basis.  (Zola Decl., Ex. H at 14; Zola Decl., Ex. I at 104; Zola Decl., Ex. J at 15.)

These three Policies also specifically indicated that "[t]here is no aggregate limit applicable to your Deductible Obligations."  (Zola Decl., Ex. H at 91; Zola Decl., Ex. I at 17; Zola Decl., Ex. J at 100.)

### B.    The Policies' Defense Language

In addition to indemnifying 3M for losses incurred under the Policies, Federal accepted a duty to defend 3M in any suit arising under the Policies.  The Policies provided that Federal "will have the right and duty to defend the **insured** against a **suit**, even if such **suit** is false, fraudulent or groundless" but that Federal has "no duty to defend any person or organization against any **suit** seeking damages to which this insurance does not apply." (Zola Decl., Ex. C at 27; Zola Decl., Ex. D at 30; Zola Decl., Ex. E. at 31; Zola Decl., Ex. F at

-7-

31, Zola Decl., Ex. G at 32; Zola Decl., Ex. H at 33; Zola Decl., Ex. I at 85; Zola Decl., Ex. J at

34 (emphasis in original).)

The Policies define "suit" to mean "a civil proceeding in which damages, to which

this insurance applies, are sought.  **Suit** includes an arbitration or other dispute resolution

proceeding in which such damages are sought and to which the **insured** must submit or

does submit with [Federal's] consent."  (Zola Decl., Ex. C at 50; Zola Decl., Ex. D at 53; Zola

Decl., Ex. E. at 61; Zola Decl., Ex. F at 61, Zola Decl., Ex. G at 62; Zola Decl., Ex. H at 63; Zola

Decl., Ex. I at 55; Zola Decl., Ex. J at 64 (emphasis in original).)

The Policies also described what expenses Federal would pay.  For the 2003–2004

and 2004–2005 Policies, "[i]f such a **suit** is brought, [Federal] will pay reasonable attorney

fees and necessary litigations expenses to defend: the **insured**."  (Zola Decl., Ex. C at 27;

Zola Decl., Ex. D at 30 (emphasis in original).)  Beginning with the 2005–2006 Policy, "[i]f

such a **suit** is brought, [Federal] will pay reasonable attorney fees and necessary litigations

expenses, that are **claim adjustment expenses**, to defend: the insured."  (Zola Decl., Ex.

E. at 31; Zola Decl., Ex. F at 31, Zola Decl., Ex. G at 32; Zola Decl., Ex. H at 33; Zola Decl.,

Ex. I at 85; Zola Decl., Ex. J at 34 (emphasis in original).)  These Policies defined "Claim

Adjustment Expenses" as including, among other things, "other reasonable expenses that

[Federal] allocate[s] to a specific claim or **suit**."  (Zola Decl., Ex. E. at 52; Zola Decl., Ex. F

at 52, Zola Decl., Ex. G at 53; Zola Decl., Ex. H at 54; Zola Decl., Ex. I at 64; Zola Decl., Ex. J

at 55 (emphasis in original).)

## II.   PROCEDURAL HISTORY

On September 22, 2021, Federal filed a Complaint with three counts seeking (1) a declaratory judgment that each claimant's alleged injury is a separate occurrence or event representing a separate deductible 3M is responsible for (i.e., more than 1,000 deductibles); (2) a declaratory judgment that defense costs in the MDL should be allocated to Federal and 3M each billing period by defense counsel based upon the proportion of claimants whose surgeries took place while the Polices were in effect; and (3) a declaratory judgment that Federal is only obligated to pay for the necessary and reasonable defense costs incurred after it received notice from 3M.  (Federal's Compl. ¶¶ 43–60, Sept. 22, 2021, Docket No. 1.)

On November 23, 2021, 3M answered and filed three counterclaims against Federal (1) seeking a declaratory judgment that a single deductible applies to the MDL for each Policy (i.e., eight deductibles) rather than one per claimant; (2) seeking a declaratory judgment that Federal is obligated to defend the entire MDL and pay all fees and expenses necessary to defend the MDL, and that Federal's defense obligations are in addition to the policy limits, regardless of the proportion of covered claims in the MDL; and (3) a breach of contract claim alleging Federal refuses to acknowledge its full defense obligation and has not paid any of the costs it is obligated to pay.  (3M's Counterclaim ¶¶ 58–76, Nov. 23, 2021, Docket No. 19.)

The parties filed cross motions for partial summary judgment on each of their first two claims to resolve (1) the number of applicable deductibles and (2) whether the

litigation costs of the MDL should be allocated based upon the proportion of claimants covered by the policies or whether Federal is responsible for the full cost.  (3M's Mot. for Partial Summ. J., Mar. 25, 2022, Docket No. 30; Federal's Mot. for Summ. J., Apr. 15, 2022, Docket No. 35.)  Therefore, each party's third claim and 3M's claim that Federal's defense obligation is in addition to the applicable policy limits are unaffected by the Motions.

## DISCUSSION

### I.      STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

-10-

## II.    ANALYSIS

There are no material facts in dispute here.  Instead, the Motions present pure questions of law as to the interpretation of the policy contracts.

The parties agree that Minnesota law governs how the Court should interpret the Policies' contract language.  (*See* Federal's Mem. Supp. Mot. Summ. J. at 18, Apr. 15, 2022, Docket No. 36.)

Under Minnesota law, the interpretation of an insurance policy is a question of law to be handled by the Court.  *See Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013).  The Court "interpret[s] insurance policies using the general principles of contract law," seeking to give effect to the parties' intent as reflected in the policy.  *Id.* Unless the policy specifically defines a term or phrase, terms and phrases "must be given their plain, ordinary, or popular meaning."  *Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 632 (Minn. 2012) (quotation and citation omitted).  The policy is "construed as a whole" according to "what a reasonable person in the position of the insured would have understood the words to mean."  *Midwest Fam. Mut. Ins.*, 831 N.W.2d at 636 (quotations and citations omitted).  Unambiguous language is given its plain and ordinary meaning.  *Id.* Policy language is ambiguous if it "is susceptible to two or more reasonable interpretations," in which case the ambiguous language is resolved in favor of the insured.  *Id.* Courts, however, should "fastidiously guard against the invitation to create ambiguities where none exist."  *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 706 (Minn. 2013) (quotation and citation omitted).  Courts

-11-

should seek, "if possible, . . . to give effect to all provisions." *King's Cove Marina, LLC v. Lambert Com. Constr. LLC*, 958 N.W.2d 310, 316 (Minn. 2021) (quotation and citation omitted).

### A.    Number of Applicable Deductibles

The parties seek resolution on the number of deductibles 3M is responsible for paying.  This turns on the meanings of "per occurrence" for the 2003–2008 Polices and "each event" for the 2008–2010 Policies.  Federal contends they mean each individual injury allegedly caused by the Bair Hugger.   3M contends they mean the design, manufacture, and sale of the Bair Hugger.

Although the deductible language changed somewhat, neither party argues this makes a difference to the outcome.  At most, 3M contends some of the differences further supports their position as some policies included options that might result in a different deductible structure that the parties specifically did not choose.  There is no reason to treat the Policies differently in this case.  The 2008–2010 Policies define "event" as "an occurrence, offense, wrongful act or other cause of loss as described under the applicable Coverage" and then, in turn, define "occurrence" using the same definition as the 2003–2008 policies.  (*E.g.*, Zola Decl., Ex. C at 49; Zola Decl., Ex. H at 62, 93.)

This Court faced a similar question with similar policy language in *H.B. Fuller Co. v. United States Fire Insurance Co.*, No. 09-2827, 2012 WL 12894484 (D. Minn. Mar. 2, 2012). In *H.B. Fuller*, at issue was whether the insured was liable for a single deductible or multiple deductibles for multiple products liability actions brought against the insured

alleging injury from asbestos-containing products the insured manufactured. *Id.* at *1–2. This turned on the meaning of "occurrence" which the *H.B. Fuller* policy defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at *9 (emphasis omitted).

The Court concluded that there was a single occurrence—the manufacturing of asbestos—not a different occurrence for each injury. *Id.* The Court reached this conclusion by looking first at *N. States Power Co. v. Fid. & Cas. Co. of N.Y.* ("*NSP*"), 523 N.W.2d 657, 664 (Minn. 1994). As the Court explained in *H.B. Fuller*, in *NSP* the Minnesota Supreme Court found there was a single occurrence from the nature of the damage— continuous and repetitive discharge of contaminating coal tar and oxide, not multiple occurrences from the discrete injuries. *H.B. Fuller*, 2012 WL 12894484, at *9. In other words, looking at the particular context, *NSP* applied a "cause test" rather than an "effect test." *Id.*

Although courts applying Minnesota law have not wholesale adopted a "cause test" to be blindly applied when construing "occurrence," it has been applied at least where the damages are continuous and repetitive in nature. *Id.* at *9–10. While the "cause test" is not applicable in every case, "occurrence" and "injury" are not the same under Minnesota law, even when the injury is more discrete than a chemical discharge. *See id.* at *10. For example, the negligent supervision of a priest who committed sexual

assault can be a single occurrence if it leads to continuous and repeated exposure to the priest. *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1390 n.5 (8ᵗʰ Cir. 1996). This is so because the "occurrence results in the injury" and "the events constituting the occurrence are distinct from the resulting injury." *Id.*

In *H.B. Fuller*, the Court found that there was a single occurrence because "Fuller's manufacture of asbestos-containing products is the same kind of singular, continuous, and repetitive cause as chemical discharge." 2012 WL 12894484, at *11. This was so because the manufacture "was based on the same formulas at each of the approximately nine plants where it was performed" and so the manufacturing process was the ultimate cause and occurrence. *Id.*

Federal urges the Court to not apply *H.B. Fuller*, arguing it inaccurately predicted Minnesota law, has not been followed in subsequent cases, and is factually distinguishable. It urges the Court to instead look to *In re Silicone Implant Ins. Coverage Litig.* ("*SBI*"), 652 N.W.2d 46 (Minn. Ct. App. 2002), *aff'd in part, rev'd in part*, 667 N.W.2d 405 (Minn. 2003), as a more on point and accurate statement of how to interpret "occurrence" and "event."

The Court remains convinced that *H.B. Fuller* accurately predicted how the Minnesota Supreme Court would have resolved the case.[3] And it remains convinced of

---

[3] In resolving substantive issues of Minnesota state law, federal courts are bound by decisions of the Minnesota Supreme Court. *Integrity Floorcovering, Inc. v. Broan-Nuton, LLC*, 521 F.3d 914, 917 (8ᵗʰ Cir. 2008). When a state supreme court has not directly addressed a question

its vitality today.  First, neither the Minnesota Supreme Court nor the Eighth Circuit has reached an inconsistent result in a case since *H.B. Fuller*.  Second, as the Minnesota Supreme Court has held and Federal does not challenge, continuous events can merge into one continuing occurrence even when it causes discrete injuries later.  *NSP*, 523 N.W.2d at 664.  Although this is most obvious in the pollution discharge context, *NSP* did not limit itself to this context.  *See id.*  Instead, *NSP* relied on *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368 (E.D.N.Y. 1988), to support its conclusion.  *NSP*, 523 N.W.2d at 664. In *Uniroyal*, the court concluded that the delivery of Agent Orange from its manufacturer to the military was a single continuous occurrence, not multiple occurrences arising from the individual injuries, sprayings, or individual deliveries.  *Uniroyal*, 707 F. Supp. at 1383– 85.  So too in *H.B. Fuller* where the occurrence was not the individual injuries, uses, or deliveries of the asbestos-containing products, but its manufacture.

Federal points to subsequent cases it contends undercut the vitality of *H.B. Fuller* citing *In re Diocese of Duluth*, 565 B.R. 914 (Bankr. D. Minn. 2017) and this Court's decisions and the Eighth Circuit's affirmance in *National Union Fire Insurance Co. v. Donaldson Co.*[4]  The *Diocese of Duluth* court specifically explained why *H.B. Fuller* was

---

before the district court, a court must attempt to predict how the state supreme court would decide the question and "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data."  *Id.* (quotation omitted).

[4] *Nat'l Union Fire Ins. Co. v. Donaldson Co.* ("*Donaldson I*"), No. 10-4948, 2012 WL 1072329 (D. Minn. Mar. 30, 2012); *Nat'l Union Fire Ins. Co. v. Donaldson Co.* ("*Donaldson II*"), No. 10-4948, 2015 WL 1292561 (D. Minn. Mar. 23, 2015); *Nat'l Union Fire Ins. Co. v. Donaldson Co., Inc.* ("*Donaldson III*"), 926 F.3d 1014 (8th Cir. 2019).

factually not applicable: the wrongful act was each separate act of sexual abuse of each child by each priest.  565 B.R. at 925.  Here and in *H.B. Fuller*, the alleged wrongful act was the design, manufacture, and distribution of the product.  In other words, while the insured "occurrence" was the actual abuse by a priest in *Diocese of Duluth*, here it is undisputed that the underlying claims do not allege **3M** used the Bair Hugger's during the surgeries.

In the *Donaldson* cases, the policies at issue had a "batch clause" that indicated that all damage arising out of "substantially the same general conditions affecting one lot of goods or products manufactured . . . shall be deemed to result from a single 'occurrence.'"  *Donaldson I*, 2012 WL 1072329, at *3.  And the two main questions addressed in *Donaldson* were (1) whether a batch clause could batch occurrences across multiple policy periods and (2) the definition of "lot."  *Donaldson III*, 926 F.3d at 1021–23.  Neither of these questions are at issue here or were in *H.B. Fuller* nor is a batch clause present here or in *H.B. Fuller*.  No opinion in the *Donaldson* case line discusses *H.B. Fuller* and, other than in a partial concurrence in *Donaldson III*, none cite or analyze any of the case law related to interpreting a standalone "occurrence" definition without a batch clause.  Therefore, the *Donaldson* line of cases do not undermine *H.B. Fuller* and are not applicable here.

Federal also urges the Court to apply *SBI* as a more reliable statement of Minnesota law and a more apposite case.[5]  The Court has explained the errors in *SBI*'s reasoning and with applying the interpretation the insurer in *H.B. Fuller* and Federal try to put on *SBI*. *See H.B. Fuller*, 2012 WL 12894484, at *10 n.15 (explaining that *SBI* "erroneously relies" on one Minnesota Supreme Court case because of distinguishing issues and "elides" *NSP* and that *SBI* "cannot bear the weight [the insurer would rest upon it").   *SBI* relies on cases that concern timing and policy triggering issues, not the number of occurrences. *See id.*  There are reasons to treat those differently.  *See id.*  Neither *SBI* nor Federal explain why timing and number should be treated similarly when the Minnesota Supreme Court has never said they are.

Direct application of any case can be difficult in this type of dispute because the context, facts, and language of the policies matters when interpreting the words of an insurance contract in general and the meaning of "occurrence" in particular.  *See NSP*, 523 N.W.2d at 663–64 (discussing different approaches for apportioning liability depending on the circumstances and noting "we have struggled with determining the number of occurrences").

---

[5] Federal suggests that *SBI* and possibly another case, *Domtar, Inc. v. Niagara Fire Ins. Co.*, No. A03-630, 2004 WL 376951 (Minn. Ct. App. Mar. 2, 2004), are controlling Minnesota case law. As these cases are Minnesota Court of Appeals cases, not Minnesota Supreme Court cases, they are not controlling on this Court.  *See Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006).

Still, the Court finds its reasoning in *H.B. Fuller* applicable here.  The facts in *H.B. Fuller* and here are sufficiently analogous for two reasons.  First, the policy definitions are very similar.  In *H.B. Fuller*, "occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  2012 WL 12894484, at *3 (emphasis omitted).  Here, "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and the Policies indicate the deductibles apply to "all bodily injury or property damage as the result of any one occurrence."  (*E.g.*, Zola Decl., Ex. C at 49.)  Similarly, in *H.B. Fuller*, the policy distinguished between occurrence and "injury" because the policy defined an "occurrence" as "an accident . . . which results in . . . injury."  2012 WL 12894484, at *9–10 (emphasis omitted); *see also Diocese of Winona*, 89 F.3d at 1390 n.5 ("The 'occurrence' and the 'injury' it produces need not have any relationship to each other in time or place.").  And here, the Policies distinguish between occurrences/events and injury, specifically stating the occurrence/event results in the injury.   Second, the underlying circumstances are similar.  In *H.B. Fuller*, the manufacturer produced a product that did not cause injury with every use, nor did it cause immediate injury but only did so in certain circumstances.  So too here: the Bair Hugger does not cause immediate injury

or do so with every use but only in some circumstances.[6]   In both cases, the underlying

claims were predicated on the manufacturers' design and production of the products.   It

is thus irrelevant if they were manufactured at different times and in different places.   *See*

*id.* at *11 (noting that the products in *H.B. Fuller* were manufactured in nine different

plants).   This distinguishes this case and *H.B. Fuller* from *Domtar, Inc. v. Niagara Fire*

*Insurance Co.*, No. A03-630, 2004 WL 376951 (Minn. Ct. App. Mar. 2, 2004).   In *Domtar*,

"the activities and causes of [the harm] at each of the sites are too varied to be considered

a single occurrence." *Id.* at *4.   Here, and in *H.B. Fuller*, there is no allegation that there

was a meaningful difference in the manufacturer's activities or the causes of harm.

　　In addition to being analogous to *H.B. Fuller*, there are other reasons to find a single

occurrence per policy period here.   First, as 3M points out, (1) the first "per occurrence"

policy initially applied the deductible on a "per claim" basis before an endorsement

changed it to "per occurrence" and (2) the "each event" policies also included the option

of applying the deductible on an "each claim" basis but 3M and Federal agreed to "each

event."   Applying a single deductible per policy gives greater meaning to these other

policy options.

　　Second, although Federal contends "occurrence"/"each event" should be

interpreted to mean the individual injuries from the individual surgeries, in the underlying

---

[6] To be clear, the Court makes no findings of fact or law as to the underlying claims against 3M.  Any statement that could be read as making such a finding is merely phrased in that manner to increase clarity and understanding in this case.

actions against 3M, the claims are based not on whether some Bair Hugger devices were

defective but rather that all Bair Huggers were defective in their design and manufacture.

(Zola Decl., Ex. K ¶¶ 1, 10, 38, 70–77, 79–100.)  Therefore, the alleged "occurrence" in the

MDL cases is not each individual exposure during surgery.  This is also very similar to

*Uniroyal* where the occurrence was the manufacture of Agent Orange, not its individual

uses by the miliary and concomitant exposures to the underlying plaintiffs.  707 F. Supp.

at 1383.

Third, although the "cause" test may not be applicable in every case, the "each

event" policies specifically define "event" to include "other cause of loss," suggesting that

in this context the "cause" test is applicable.  The "cause" alleged in the MDL is the design

and manufacture which did not occur with each surgery.

In sum, under Minnesota law, courts take a pragmatic approach to the context and

facts, looking at what the insurance policies cover under the facts in relation to the alleged

claims against the insured.  Here it is 3M's actions which are its single continuous and

repetitive design and manufacture of the allegedly defective Bair Hugger.[7]  If presented

with this case, the Court predicts the Minnesota Supreme Court would hold the same.

_____

[7] In light of the policy language and caselaw, the terms "occurrence" and "each event"
are reasonably susceptible only to the meaning discussed above.  The terms are therefore not
ambiguous.  If, however, the Court found the terms ambiguous, the Court would resolve this
ambiguity against Federal and in favor of 3M to reach the same result.  *See Midwest Fam. Mut.
Ins. Co.*, 831 N.W.2d at 636.

Therefore, 3M satisfies its obligation under the Policies by paying a single deductible per policy.

### B.     Federal's Duty to Defend

The parties also seek resolution on Federal's responsibility for paying the defense costs associated with the underlying MDL.  3M contends Federal is responsible for paying the full defense cost.  At least for the purposes of these Motions, Federal agrees that it is responsible for paying some of the cost but contends that it should only pay costs proportional to the number of cases in the MDL that are covered by the Policies.

Under Minnesota law, "[t]he duty to defend an insured is contractual and is broader than the duty to indemnify."  *Cargill, Inc. v. Ace Am. Ins. Co.*, 784 N.W.2d 341, 349 (Minn. 2010).  It is broader in three ways: "(1) the duty to defend extends to every claim that 'arguably' falls within the scope of coverage; (2) the duty to defend one claim creates a duty to defend all claims; and (3) the duty to defend exists regardless of the merits of the underlying claims."  *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006).  "An insurer trying to avoid a duty to defend has the burden of establishing that all parts of the cause of action fall clearly outside the scope of coverage."  *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 576 (Minn. 2009) (quotation and citation omitted).  Absent language in a policy explicitly stating that an insurer need not do so, insurers have a duty to defend an entire suit if any part of the suit might be covered by the policy.  *Remodeling Dimensions, Inc. v. Integrity Mut. Ins.*

*Co.*, 819 N.W.2d 602, 616 (Minn. 2012); *see also Bethel v. Darwin Select Ins. Co.*, 735 F.3d 1035, 1039 (8th Cir. 2013).

The Policies' language is clear that Federal has a duty to pay for the defense costs against a "suit" which is defined as "a civil proceeding in which damages, to which this insurance applies, are sought" and includes arbitrations and other dispute resolution mechanisms in which damages are sought and to which 3M must submit. (Zola Decl., Ex. C at 50.) The Policies are also clear that Federal has no duty defend against any suit to which insurance provided by the Policies does not apply.

This issue then turns in part on the nature of the underlying MDL, specifically whether under the Policies it is one "suit" or whether each individual case in the MDL is a "suit."

To understand what an MDL is, the Court begins with the statute that allows for forming an MDL, which provides:

> When **civil actions** involving one or more common questions of fact are pending in different districts, such **actions** may be transferred to any district **for coordinated or consolidated pretrial proceedings**. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and **will promote the just and efficient conduct of such actions**. **Each action so transferred shall be remanded** by the panel **at or before the conclusion of such pretrial proceedings** to the district from which it was transferred unless it shall have been previously terminated.

28 U.S.C. § 1407(a) (emphasis added).

-22-

The plain language of the statute supports a conclusion that the underlying cases in an MDL are separate actions that are merely grouped together for coordinated or consolidated proceedings.  They can be treated individually by remanding or terminating an individual case even if the MDL is not terminated.  The cases are also treated separately before transfer and after remand.  Therefore, "[s]ection 1407 refers to individual 'actions' which may be transferred to a single district court, not to any monolithic multidistrict 'action' created by transfer."  *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015).  And the purpose of an MDL is convenience, justice, and efficiency, not to affect substantive legal rights.

Because the statute refers to them as individual actions, the law treats the individual cases in an MDL as distinct.  "Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities" and forming the MDL, therefore, does not "meld" individual actions "into a single unit."  *Id.* at 413–14.  "Section 1407(a) speaks not in terms of imbuing transferred actions with some new and distinctive venue character, but simply in terms of 'civil actions' or 'actions.'"  *Lexecon*, 523 U.S. at 37.  It is for this reason, if a particular case in an MDL is dismissed by the MDL court before the MDL itself is terminated, a party to the dismissed case can immediately appeal the dismissal under 28 U.S.C. § 1291.  *Gelboim*, 574 U.S. at 407–08.  This is unlike the dismissal of a particular

party or claim in a single case, which typically requires a court to expressly enter judgment under Federal Rule of Civil Procedure 54(b) before a party can appeal. *See id.* at 409.[8]

Underlying cases retaining their individual identity is also consistent with the operation of MDLs. After an MDL is formed, parties continue to be the master of their individual cases and can take positions different from the other parties ostensibly on the same side of the MDL. MDL courts can create separate tracks and issue separate rulings for different cases to ensure each case is resolved appropriately. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005). When addressing issues of substantive law for a particular case, a transferee court also must consider whether to apply the law of the transferee district and circuit or the transferor court's district and circuit. *See* Manual for Complex Litigation § 20.132, at 222 (4th ed.). This is so because the transferee court applies the law of the circuit it is in to issues of federal law, but on issues of state law the MDL court applies the state law that would have been applied to the underlying case as if the case had never been transferred into an MDL. *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 391 F.3d 907, 911 (8th Cir. 2004). This may require a court to apply different law to the individual cases within the MDL. *See In re Dow Co. Sarabond*

---

[8] Treating MDL cases as separate cases is also consistent with broader federal consolidation law including consolidation under Federal Rule of Civil Procedure 42. In *Hall v. Hall*, 138 S. Ct. 1118 (2018), the Supreme Court, in part by applying the logic of *Gelboim,* held that parties whose cases are terminated after Rule 42 consolidation can immediately appeal even if the remaining cases are not yet appealable. The court found that throughout the history of federal consolidation law, the term "consolidate" has not meant a "complete merger" "of constituent cases," but rather that the cases retain their "independent character." *Id.* at 1125.

*Prods. Liab. Litig.*, 666 F. Supp. 1466, 1468–70 (D. Colo. 1987) (applying the law of four different circuits to different cases in the same MDL).[9]

In sum, under the plain and ordinary application, the individual cases within an MDL—including the underlying cases in the Bair Hugger MDL—retain their individual character and the MDL is not a single case.[10]

Although from a court's perspective the cases making up the MDL remain separate entities, parties generally have freedom of contract, and it may be possible for parties to draft a contract such than an insurer incurs a duty to pay the defense costs for an entire MDL even when it would not have a duty to defend each underlying case were an MDL never formed.

Very few courts appear to have considered how a contractual duty to defend interacts with an MDL. Of the cases the Court is aware—all applying the law of other

---

[9] Indeed, just days after briefing closed on these Motions, the transferee court examined an individual underlying case to determine what law applied. *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, No. 21-CV-2752, 2022 WL 1658142, at *3 (D. Minn. May 25, 2022).

[10] There may be an exception to the general rule of treating cases individually if the parties file a master complaint and a consolidated answer that supersedes the individual pleadings. *See Gelboim*, 574 U.S. at 413 n.3. Even if this possible exception may affect the outcome in some cases, "[n]o merger occurs . . . when 'the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs.'" *Id.* (quoting *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590 (6th Cir. 2013)). Here, there is a master complaint in the Bair Hugger MDL, but the master complaint is labeled as merely an "administrative device." (Zola Decl., Ex. K at 2.) Therefore, each individual case "retains its separate legal existence," *In re Refrigerant*, 731 F.3d at 590, and the Court expresses no opinion as to whether such a master complaint would affect a dispute over an insurer's defense duty.

states, a slight majority treated or thought it likely it should treat each case in an MDL separately.[11]  The Court is unaware of any case addressing this issue applying Minnesota law.

The Policies here indicate that Federal has a duty to defend against a "suit" which the Policies define as "a civil proceeding in which damages, to which this insurance applies, are sought."  (*E.g.*, Zola Decl., Ex. C at 50.)  Of course, an MDL is a type of civil proceeding.  As discussed above, however, under the plain, ordinary meaning of an MDL the individual cases are treated individually as their own proceedings within the MDL even if many decisions are made en masse.  Moreover, the Policies' full language makes clear that the Bair Hugger MDL as a whole is not a suit to which the defense duty applies en masse.  This is so for two reasons.  First, the duty to defend only applies to civil proceedings in which damages are sought.  Damages are not sought **in** the MDL itself but **in** each underlying case.  Second, the Policies specifically disclaim that Federal has a duty to defend in any suit to which the insurance does not apply.  Requiring Federal to defend

---

[11] *Compare Budd Co. v. Travelers Indem. Co.*, 820 F.2d 787, 790–91 (6th Cir. 1987) (apportioning the total costs by the number of cases covered under Michigan law); *Pa. Mfrs' Ass'n Ins. Co. v. N.C. Mut. Wholesale Drug Co.*, No. 19-1045, 2020 WL 9815386, at *7 (M.D.N.C. Sept. 30, 2020) (delaying resolution of the issue under North Carolina law but noting "In an MDL, where individual cases are consolidated for pretrial purposes but remain fundamentally separate actions, 28 U.S.C. § 1407, **it appears that each case would need to be analyzed separately to determine the duty to defend**." (emphasis added)); *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487 (Tex. 2008) (analyzing the duty to defend case by case under Texas law), *with Charter Oak Fire Co. v. Am. Cap. Ltd.*, No. 09-0100, 2017 WL 3315306, at *29–30 (D. Md. Aug. 3, 2017), *aff'd sub nom. Charter Oak Fire Ins. Co. v. Am. Cap., Ltd.*, 760 F. App'x 224 (4th Cir. 2019) (requiring an insurer to pay for the defense costs of the entire MDL under Maryland law).

against the entire MDL would force it to defend thousands of individual cases to which the insurance specifically does not apply.

3M also argues that because all the cases in the MDL present common issues they are inextricably intertwined. Therefore, according to 3M, there is no basis for distinguishing between the individual cases for allocating defense costs as they are based on the same legal theories and factual allegations. The cases 3M cites in support of this contention cannot bear the weight 3M would rest on them. *Charter Oak Fire* is distinguishable for three reasons: (1) the court applied Maryland law, not Minnesota law; (2) the court found all the underlying cases in the MDL "clearly alleged potentially covered claims" at the time the duty to defend arose whereas here it is undisputed that some of the underlying cases would not be covered but for the MDL; and (3) the court applied the inextricably intertwined reasoning to resolve whether to allocate costs based on covered and uncovered parties, not covered and uncovered suits as is the case here. *See Charter Oak Fire Co. v. Am. Cap. Ltd.*, No. 09-0100, 2017 WL 3315306, at *29–30 (D. Md. Aug. 3, 2017), *aff'd sub nom. Charter Oak Fire Ins. Co. v. Am. Cap., Ltd.*, 760 F. App'x 224 (4th Cir. 2019). Although *Jostens, Inc. v. CNA Insurance/Continental Casualty Co.*, 403 N.W.2d 625, 631 (Minn. 1987), applies Minnesota law, there the Minnesota Supreme Court refused to allocate defense costs in a single **class action**, not an MDL. Unlike an MDL, a class action is a single case and class actions are governed by Federal Rule of Civil Procedure 23, not 28 U.S.C. § 1407.

In view of the Policies' language and how the MDL statute and courts handle MDLs and their constituent cases, the Policies' defense duty language is reasonably susceptible to only one meaning which does not require Federal to pay the full cost of the MDL. Superficially, this may appear in tension with Minnesota law that extends the duty to defend "to every claim that 'arguably' falls within the scope of coverage." *Wooddale Builders*, 722 N.W.2d at 302. This tension is resolved by distinguishing between claims and cases. Absent policy language to the contrary, Minnesota law requires defense of all claims within a case to which a defense duty attaches but it does not require defense of a case in which a defense duty does not attach to any part of any claim even if the case is related to one the insurer has a duty to defend. *See id.*; *Gen. Cas. Co. of Wis.*, 762 N.W.2d at 576. The Policies explicitly state the duty does not extend to the non-insured cases. *See Remodeling Dimensions*, 819 N.W.2d at 616. Because the Policies and the law treats MDL constituent cases individually, "all parts of the cause of action" in the uninsured cases "fall clearly outside the scope of coverage." *Gen. Cas. Co. of Wis.*, 762 N.W.2d at 576.[12] If presented with this case, the Court predicts the Minnesota Supreme Court would

---

[12] Federal raises another reason that further supports this conclusion. Under 3M's approach, if even one case in an MDL gave rise to a duty to defend, the insurer could be required to pay for the defense of the entire MDL. This may incentivize insureds to play games with their insurance and MDLs to sneak a single case with such a duty into an MDL and may incentivize insurers to resist MDL formation. It could also disrupt an MDL if all the insured cases terminate, and the insurer's attorneys withdraw as the insurer is no longer involved in the case. Finally, forcing insurers to defend an entire MDL would mean the decision to create an MDL would affect the legal rights of insurers and insureds. Such a rule may have a similar effect in Rule 42 consolidation and consolidation on appeal. This may make the Joint Panel on Multidistrict

hold the same.  Therefore, Federal is only obligated under the Policies to pay the defense costs associated with the cases within the MDL that include claims that are arguably covered by the Policies.

Because Federal is not obligated to pay the full costs associated with the MDL, that leaves the question of how costs should be allocated.  Federal proposes having defense counsel allocate the costs each billing period based upon proportion of covered claimants.  3M, opposing any division of costs, did not propose a method.  Because 3M has not weighed in on a method of apportioning costs, there may be factual disputes as to which cases include covered claims, and using a ratio may be inequitable in some circumstances, the Court will not resolve what method is appropriate at this time.

## CONCLUSION

In sum, the Court will grant in part and deny in part both parties' Motions for Summary Judgement.  Specifically, the Courts finds that (1) the Policies' terms "per occurrence" and "each event," construed in light of Minnesota law, refers to the design and manufacture of the Bair Hugger such that 3M is only liable for a single deductible for each policy period and (2) Federal's defense duty under the Policies only obligates it to pay the costs that are associated with the individual cases within the Bair Hugger MDL

---

Litigation and courts more reluctant to form MDLs and consolidate cases.  All forms of consolidation are meant to increase judicial efficiency, not affect legal rights.

that include claims that are arguably covered by the Policies, not to pay the full defense cost of the MDL.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. 3M Company's Motion for Partial Summary [Docket No. 30] is **GRANTED in part** and **DENIED in part** as follows:

   a. The Court **DECLARES** that the Federal Insurance Policies require that at most a single deductible applies to the Bair Hugger Multidistrict Litigation, *In re: Bair Hugger Forced Air Warming Devices Product Liability Litigation*, MDL No. 15-2666 (D. Minn.), against 3M for each policy period governed by the Federal Insurance Policies bearing policy number 7498-46-66 MIN in effect from April 1, 2003, through October 13, 2010. Accordingly, no more than eight deductibles shall be applied in the Bair Hugger Multidistrict Litigation against 3M.

   b. 3M Company's Motion is **DENIED** in all other respects.

2. Federal Insurance Company's Motion for Partial Summary Judgment [Docket No. 35] is **GRANTED in part** and **DENIED in part** as follows:

   a. The Court **DECLARES** that under the Federal Insurance Policies bearing policy number 7498-46-66 MIN in effect from April 1, 2003, through October 13, 2010, with regards to those civil actions

transferred for coordinated and consolidated for pretrial proceedings in the Bair Hugger Multidistrict Litigation, *In re: Bair Hugger Forced Air Warming Devices Product Liability Litigation*, MDL No. 15-2666 (D. Minn.), Federal Insurance Company owes a duty to defend only those underlying civil actions that include claims that are arguably covered by the Policies and not any other civil action within the Bair Hugger Multidistrict Litigation.

b.  Federal Insurance Company's Motion is **DENIED** in all other respects.

DATED: November 23, 2022
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge